**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

| In re | |
|---|---|
| **J. BRADFORD JONES,** | **Chapter 13** |
| | **Case No. 09-18024-FJB** |
| Debtor | |

**MEMORANDUM OF DECISION ON DEBTOR'S OBJECTION TO PROOF OF CLAIM**
**OF 1105 MASSACHUSETTS AVENUE CONDOMINIUM TRUST**

In the matter before the court, the chapter 13 debtor, J. Bradford Jones (the "Debtor"), objects under 11 U.S.C. § 502(b)(1) to the amount of the $35,219.44 secured claim asserted in this case by the Board of Trustees of 1105 Massachusetts Avenue Condominium Trust (the "Trust"). The claim is based in part on a state court judgment for common area fees; the remainder consists of related postjudgment assessments. The Debtor maintains that he is at most obligated for two months' common area charges totaling approximately $500. For the reasons set forth below, the court will allow the claim in the amount requested.

**PROCEDURAL HISTORY**

The Debtor filed a petition for relief under Chapter 13 of the Bankruptcy Code on August 23, 2009, thereby commencing this bankruptcy case. The Trust filed a proof of claim in the case on September 9, 2009, asserting a secured claim in the amount of $35,260.94, secured by a lien on the Debtor's unit. The proof of claim indicates that the claim is for unpaid condominium common area fees. As an attachment to the proof of claim, the Trust also filed an accounting of the Debtor's obligation to the Trust, including all transactions from 1991 to September 2009 in monthly increments; the starting balance in 1991 is an unexplained "balance forward" from the previous year. The spreadsheet itemizes the balance owed in terms of condo fees, late fees, and other charges, and it further details credits for payments received from the Debtor. Also attached to the proof of claim are (i) detailed invoices from the Law Offices of

Goodman & Shapiro, LLC for legal fees incurred by the Trust in enforcing its charges against the Debtor and (ii) further itemized invoices from Paul E. Saperstein Company ("the Auctioneer"), an auctioneer, to Goodman & Shapiro, LLC, for services rendered in conjunction with two planned foreclosures by the Trust of its lien on the Debtor's unit.[1]

On October 5, 2009, the Debtor filed an objection to the proof of claim (the "Objection"), challenging the validity of numerous fees, charges, and assessments and asking this court to determine the proper amount of the claim. In his objection, the Debtor explains that the Trust had obtained a judgment for much of the amount being sought in its proof of claim,[2] but that the Debtor, having been unable to pay the contested amount, had been barred by state law from actually litigating the validity of the charges he contested and therefore had suffered this judgment to enter against him without a fair opportunity to actually litigate the charges. He argues that he should therefore be permitted in this proceeding to challenge the charges on which the judgment is based.

In a response to the Objection, the Trust argues that the Debtor should not now be permitted to relitigate the state court action and that the judgment is binding on him for purposes of the present claim. The Trust also defends charges that have been assessed since entry of the judgment, including significant attorney's fees and auctioneer's fees and expenses that the Trust incurred in attempting to foreclose its statutory lien on the Debtor's unit.

After a preliminary hearing on the Objection, the Court scheduled an evidentiary hearing. In the scheduling order, the Court stated that, to establish that portion of its claim that is based on amounts awarded through a state court final judgment, the Trust could simply present evidence of that judgment, in which event the hearing would then focus on those portions of the claims that are not attributable to that judgment.

---

[1] In each instance, the foreclosure was averted when the Debtor filed first one and then (after the first was dismissed) a second bankruptcy petition.

[2] The Debtor mistakenly stated that the judgment was for an amount "slightly more than $34,000." The correct amount was $19,320.94.

2

At the outset of the evidentiary hearing, held on March 16, 2010, the Trust moved to amend its proof of claim by appending to it an attested-to copy of the state court judgment, which the Trust adduced at the evidentiary hearing, and the Court allowed this motion without objection from the Debtor.  Accordingly, on March 18, 2010, the Trust filed an amended proof of claim in the amount of $35,219.44 (approximately $41 less than the amount claimed in the original proof of claim; the Trust has offered no explanation for the discrepancy), supplemented this time by a copy of the judgment on which the claim is partially based.[3]  Of its total claim of $35,219.44, $19,320.94 is attributable to the judgment.  The Trust contends that the balance of $15,898.50 is the sum of the monthly common area fees, late charges, and attorney's and auctioneer's fees and expenses that accrued after August 2008 and before the Debtor's bankruptcy filing on August 23, 2009, less the one payment that the Debtor made during that period.

At the evidentiary hearing, the Trust presented three witnesses:  Myra Miller, the manager of and long-time bookkeeper for the 1105 Massachusetts Avenue Condominium, to testify to the validity of the Trust's records; Attorney Ellen Shapiro, of the Law Offices of Goodman & Shapiro, LLC, counsel to the Trust, to testify regarding the Trust's attorney's fees; and Jeffrey Mann, Senior Vice President of the Auctioneer, Paul Saperstein Company, to testify regarding the Auctioneer's charges the Trust incurred.  Attorney Shapiro's direct testimony was submitted by affidavit, which affidavit the Court received into evidence; she was cross-examined at the hearing.  The Debtor presented only the testimony of the Debtor himself.  After the conclusion of the hearing, the parties submitted briefs in lieu of closing arguments, and court then took the matter under advisement.

---

[3] The original proof of claim appears on the claims register as number 1, the amended as number 1-2.

3

**FINDINGS OF FACT**

The Debtor purchased unit 4G of the 1105 Massachusetts Avenue Condominium, in Cambridge, Massachusetts, in 1978 and has owned the unit since that time.  In 2007, the Trust brought suit against him in Cambridge District Court for unpaid common area charges and to establish its right to collect those fees by foreclosing on its statutory lien on the unit. The Debtor had the assistance of counsel in the matter for at least a portion of the action.  He did actually litigate some issues, at least in conjunction with a motion for summary judgment, but the precise progress of the litigation is not otherwise in evidence.  On November 4, 2008, the District Court entered judgment for the Trust and against the Debtor in the total amount of $19,320.94, consisting of common expenses through August 2008 of $15,569.92 and attorney's fees and court costs for the prosecution of that action in the further amount of $3,751.00. The judgment further declared that this sum constituted a lien on Unit 4G having priority over all other liens on the unit other than liens recorded before the condominium's Master Deed and liens for real estate taxes and other municipal charges against the unit. The judgment further permitted the Trust to sell Unit 4G in an attempt to satisfy the judgment debt, and it specified that the Trust would be entitled to all costs incurred in proceeding with the sale, such as advertising costs, attorney's fees, and auctioneer's fees related thereto, which fees and costs would be considered part of the priority lien.  The judgment also orders the Debtor to pay to the Trust all common expenses lawfully assessed against him and all late charges and attorney's fees and costs unpaid by him after August 2008.  The Debtor filed a notice of appeal from this judgment but did not prosecute the appeal, and, on motion of the Trust, it was dismissed for nonprosecution.  The judgment is valid and subsisting, and the Debtor does not contend otherwise.

After entry of judgment, the Debtor made only one payment to the Trust, a payment of $260 in September 2008.  The Trust incurred further attorney's fees in conjunction with Debtor's appeal of the judgment.  Eventually, the Trust commenced proceedings to foreclose its lien and

4

to that end, through counsel, employed Paul E. Saperstein Co. as auctioneer. The Trust scheduled the foreclosure sale for June 30, 2009. The Trust advertised the sale, in part through its counsel, who placed legal notices in the Cambridge Chronicle, and in part through the Auctioneer, who further advertised the sale in appropriate newspapers; and for these ads the Trust, through its attorney and auctioneer, incurred advertising expenses. On June 28, 2009, two days before this sale was to occur, the Debtor filed his first bankruptcy petition (not the one that commenced this case). This filing required that the foreclosure sale be cancelled or continued. The Auctioneer appeared at the property on the date and time appointed for the sale and adjourned the sale to August 27, 2010. For its services in conjunction with the June 30 sale and its adjournment, the Auctioneer charged the Trust $750, its standard fee. This charge, Jeffrey Mann explained, consisted of two parts: $450 for the work involved in initially planning and scheduling the auction sale scheduled for June 30, 2009, and $300 for its services in conjunction with the continuance of the scheduled auction. Both amounts are standard charges of the Auctioneer. The cancelation fee in particular is a usual and ordinary fee of the Auctioneer, made necessary by the fact that so many of the sales for which it prepares are averted by last-minute bankruptcy filings. Even when the sale does not go forward, the auctioneer incurs expenses.[4]

The Debtor's first bankruptcy case was dismissed on July 31, 2009 for the Debtor's failure to comply with an order of the Court requiring him to file proof of insurance. The Trust then recommenced its plans to conduct an auction sale of the property, now rescheduled to August 27, 2009. To that end, the auctioneer placed additional advertisements in local newspapers and, in doing so, incurred further advertising expenses of $830. On August 23, 2009, the Debtor filed his second bankruptcy petition, which commenced the present case and

---

[4] The Debtor would have the Court find that the Auctioneer works on a contingency basis, getting paid only if the property actually sells. There is no evidence to support this position. Jeffrey Mann testified credibly that when property did sell, the auctioneer's fee was calculated as a percentage of the sale price—not a contingency basis but a commission; and he also testified that when a sale did not occur, it was the usual practice of the Auctioneer to assess the fees assessed here.

5

again caused the automatic stay to go into effect.  This stayed the August 27 foreclosure and required that it be cancelled or continued.  At the hour appointed for the sale, the auctioneer appeared at the property and cancelled the sale.  In conjunction with the cancellation of the August 27 auction, the auctioneer charged the Trust an additional $300, its usual and ordinary cancelation fee.

In accordance with the business records of the Trust and the testimony of Myra Miller in support of the accuracy of those records, I find that between August 2008 and the date on which the Trust filed its proof of claim, the Debtor became obligated to pay monthly common area charges for thirteen months, ten at $241 per month and three at $248 per month, a total of $3154, and twelve late fees totalling $1136.  As Ms. Miller credibly testified, the late fees were calculated in accordance with the rules governing the condominium association, which require that late fees be assessed and calculated monthly in an amount equal to the prime rate of interest as applied to the unit owner's unpaid common area charges, but not also to the unpaid late fees or attorney's fees.  I further find that the records of the Trust, as maintained and overseen by Ms. Miller, are accurate in reflecting that the Debtor made only one payment of $260 during the period after August 2008.  The Debtor testified that he only ever failed to pay two months' common area charges in all his years as a unit owner, but his testimony was wholly lacking in credibility—on this point and many others.

**<u>DISCUSSION</u>**

Under the Bankruptcy Code, a timely filed proof of claim is deemed allowed "unless a party in interest . . . objects."  11 U.S.C. § 502(a).  Where a party in interest does so object, the Code provides that "the court, after notice and a hearing, shall determine the amount of such claim . . . and shall allow such claim in such amount," 11 U.S.C. § 502(b), "except to the extent that . . . such claim is unenforceable against the debtor and the property of the debtor, under

6

any agreement or applicable law for a reason other than such claim is contingent or unmatured."

11 U.S.C. § 502(b)(1).

When a party in interest objects to a proof of claim, the proof of claim, if properly filed, enjoys prima facie validity, and the objecting party bears the initial burden of rebutting that prima facie case.

> A proof of claim executed and filed in accordance with the Federal Rules of Bankruptcy Procedure constitutes prima facie evidence of the validity and amount of the claim. FED. R. BANKR. P. 3001(f); see also *Juniper Dev. Group v. Kahn (In re Hemingway Transp., Inc.),* 993 F.2d 915, 925 (1st Cir.1993). In order to rebut this prima facie evidence, the objecting party must produce "substantial evidence." *United States v. Clifford (In re Clifford),* 255 B.R. 258, 262 (D. Mass. 2000) (*Hemingway Transport,* 993 F.2d at 925). If the objecting party produces substantial evidence in opposition to the proof of claim and thereby rebuts the prima facie evidence, the burden shifts to the claimant to establish the validity of its claim. *Hemingway Transport,* 993 F.2d at 925 ("Once the trustee manages the initial burden of producing substantial evidence . . . the ultimate risk of nonpersuasion as to the allowability of the claim resides with the party asserting the claim."). Where the proof of claim is not filed in accordance with the Federal Rules of Bankruptcy Procedure, the proof of claim does not constitute prima facie evidence of the validity and amount of the claim, and therefore the burden of proof rests at all times on the claimant.

*In re Long*, 353 B.R. 1, 13 (Bankr. D. Mass. 2006). When a claim is based on a writing, the rules require that the original or a duplicate of the writing be filed with the proof of claim. FED. R. BANKR. P. 3001(c).

The claim in question is comprised of two parts: one for $19,320.94, which is founded on a judgment that quantified and established a right of recovery for all charges that accrued before its entry, and another for the balance of $15,898.50, which is based on charges that accrued after entry of the judgment.

    a.    **The Judgment**

The Debtor objects to that portion of the claim that is based on the judgment on three grounds: that the claim has no prima facie validity because the judgment was not attached to the proof of claim; that the judgment is not preclusive here because he was prevented by state law from actually litigating the validity of the underlying assessment; and because the underlying assessments are invalid and not supported by evidence. For the reasons set forth below, the Court rejects the first two and therefore need not address the third.

The Debtor first argues that the proof of claim does not constitute prima facie evidence of the validity and amount of the claim because the claim is based on a writing, the state court judgment, but the Trust did not attach the judgment to the original proof of claim. This argument ignores that fact that the Trust, with leave of court and without objection by the Debtor, amended its proof of claim to attach the writing. The proof of claim is therefore validly supported and does not lose its prima facie validity for failure of the Trust to attach the judgment on which it is based.

The Debtor next argues that the judgment should not be deemed preclusive in this proceeding as to the amount and validity of the debt it adjudicated. He states that Massachusetts law, which he contends requires a condominium unit holder to pay a disputed assessment before he can challenge its validity in court, prohibited him from challenging the validity of certain assessments in the state court proceeding.[5] He states that he lacked the ability to pay the assessments and therefore was denied an opportunity in the state court proceeding to be heard on the validity of the assessments that form the basis of the judgment. To be clear, the Debtor does not challenge the validity of the judgment itself. He merely contends that it arises from a proceeding in which he was not permitted to actually litigate the validity of certain now-disputed assessments, and therefore that the judgment should not preclude relitigation of the issues now, on his objection to the Trust's claim.

---

[5] For this proposition the Debtor cites *Blood v. Edgar's, Inc.*, 36 Mass.App.Ct. 402, 406 (1994).

The Court finds no merit in this argument because, with respect to the assessments that form the basis of the judgment, the judgment itself is not merely a determination of the underlying rights but is itself the basis of recovery.  Unless the judgment itself is invalid, the fact of the judgment, by itself and regardless of the merits of the claims that gave rise to it, is the basis of the claim.  A judgment is a right to payment in itself, independent of the right of action that gave rise to it.  The Supreme Court long ago held that the grounds on which a court may reexamine a judgment that forms the basis of a proof of claim are limited:  "a proof of claim based on a judgment . . . may be assailed in the bankruptcy court on the ground that the purported judgment *is not a judgment* because of want of jurisdiction of the court which rendered it over the persons of the parties or the subject matter of the suit, or because it was procured by fraud of a party."  *Heiser v. Woodruff*, 327 U.S. 726, 736-37 (1946) (citations omitted; emphasis added).  But where a judgment is not invalid—does not, for fraud or want of jurisdiction, lack the force of a judgment—a bankruptcy court may not reexamine the issues it determined.  *Id.* at 737.  Here the Debtor challenges only the merits of the judgment, not its validity.  As a judgment, it gives the Trust a right to payment and therefore a valid claim.  11 U.S.C. § 101(5) ("'claim' means right to payment").

The Debtor nonetheless argues that the state court judgment lacks preclusive effect because certain underlying issues, those concerning the validity of the assessments, were not actually litigated.  His argument is misplaced.  In Massachusetts law,[6] the actual litigation of a claim is necessary for collateral estoppel, or issue preclusion,[7] but not for res judicata, or claim preclusion.[8]  Here only the latter is in issue.  The Trust is not using the judgment here for its preclusive effect as to discrete issues of fact or law that were decided by the judgment.  Rather,

---

[6] The preclusive effect of a judgment is determined by the law of the state whose courts issued it, here the Commonwealth of Massachusetts.  28 U.S.C. § 1738 (the judicial proceedings of any state of the United States "shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State . . . from which they are taken"); *Nottingham Partners v. Trans-Lux Corp.,* 925 F.2d 29, 32 (1st Cir.1991) ("In ascertaining whether issue preclusion flows as a consequence of previous state court litigation, a federal court must look to state law").
[7] *Fireside Motors, Inc. v. Nissan Motor Corp. in U.S.A.*, 395 Mass. 366, 372-373 (1985).
[8] *Kobrin v. Board of Registration in Medicine*, 444 Mass. 837, 843 (2005) (claim preclusion requires identity of claim, identity or privity of parties, and a prior final judgment on the merits).

9

the only fact that needs to be established is that there is a prior final judgment on the merits between these parties as to the claim in issue. The existence of such a judgment is undisputed. The Court therefore may not look behind the judgment or consider the numerous issues the Debtor raises as to the validity of the underlying assessments.

### b.  **Postjudgment Assessments**

The Debtor also objects to that portion of the claim that arises from charges assessed after the period covered by the judgment. The judgment entered on November 4, 2008, but it quantified charges that accrued only through August 2008. The balance of the Trust's claim is $15,898.50. This amount, the Trust contends, is the sum of $3154 in monthly common area fees, $1136 in late charges, and $12,674 in attorney's fees and expenses (the attorney's expenses consisting in part of $3305 in auctioneer's fees and expenses) that accrued after August 2008 and through September 2009, the first month after the Debtor's bankruptcy filing on August 23, 2009, [9] less the one payment of $260 that the Debtor made during that period.[10] The Debtor challenges the late fees in general and certain of the attorney's fees and the auctioneer's fees and expenses.

### i.  **Late Fees and Common Area Charges**

With respect to the late fees, the Debtor objects on two grounds: (i) that they appear to vary considerably in amount from month to month without rhyme or reason; and (ii) that they are assessed even in months where payments were made. As to these, Myra Miller testified knowledgably and credibly that in accordance with the rules governing the condominium association, late charges are required to be assessed and were assessed monthly, on the last

---

[9] The claim is a secured claim and, to the extent of value in the collateral, may increase on account of postpetition charges permitted by the state statute under which the lien arises. 11 U.S.C. § 506(b). Here, there is no dispute that there is equity in the property to fully fund the Trust's lien.

[10] These itemized amounts, which total $16,704, when added to the judgment would bring the total claim to $36,024.94, which is $805.50 more than the amount of the Trust's amended proof of claim. The Trust does not explain the discrepancy, and neither party seems aware of it.

day of each month, at the then-applicable prime rate on the common area charges outstanding, but not on unpaid attorney's fees or late charges. This explains both why the late charges vary in amount from month to month—in this period they increase slightly from one month to the next—and why they accrue even in months in which a payment is made (provided it is one that does not pay in full the past-due common area charges). The late charges therefore appear to be appropriately charged.

As to common area charges, the Debtor does not dispute that he incurred and was properly assessed monthly common area charges totaling $3154. He appears to challenge the Trust's position that he made only one payment of $260. I have found the Debtor's testimony on this issue incredible and notably unsupported by evidence of further payments. The Trust has carried its burden of proof on the issue.

###        ii.        Attorney's Fees and Expenses

With respect to attorney's fees and expenses, the Debtor stated that the total fees charged do not seem unreasonable but that eight specific charges did, at least in the absence of further explanation, appear unreasonable: one for attorney's fees incurred prior to entry of the judgment, two for attorney's fees incurred after the judgment, one postjudgment expense of $2232 for the cost to the firm of publishing legal notices regarding the auction sales in the Cambridge Chronicle, and four relating to the auctioneer's fee.[11]

The charge that arose before entry of the judgment was incorporated into the judgment itself. The objection to that charge is therefore overruled for the reasons set forth above with respect to the portion of the claim that arises from the judgment.

The two charges for attorney's fees that arose after the judgment are a charge of $175 on July 1, 2009, and further charges of $285 in late August 2009, both for the firm's review and initial response to the notice it received of the Debtor's first and second bankruptcy filings. The

---

[11] The auctioneer's fees and expenses were expenses of the Trust's attorneys and were billed to the law firm and not directly to the Trust.

11

Debtor objects on the basis that these charges do not relate to enforcement of the Trust's lien on the Debtor's unit and therefore are not charges that can become part of the lien under state law. The Debtor does not elaborate. In view of the fact that the Debtor's bankruptcy filings interrupted the Trust's attempt to enforce its lien by foreclosure, the Trust's and the firm's efforts to deal with the bankruptcy filing clearly do relate to enforcement of the lien. The charges are valid.[12]

The Debtor also objects to the firm's postjudgment charge for the cost of publication in a local newspaper, the Cambridge Chronicle, of legal notices regarding the auction sales. The Debtor contends these charges are excessive in view of the fact that no auction sale ever occurred. This objection is frivolous and surely disingenuous. As the Debtor and his counsel well know, the planned auction sales were in both instances derailed at the last minute, after legal notices had been published and the publishing costs incurred.

### iii. Auctioneer's Fees and Expenses

This leaves only the auctioneer's fees and expenses. The auctioneer sent two invoices to the law firm, one dated July 21, 2009, for $1,905.00, and a second dated August 27, 2009, for an additional $1,130.00 relating to the rescheduling of the auction. The Debtor articulates four separate objections to these charges: first, that the $1,905.00 invoice amount is excessive because no auction ever took place; second, that the amount of the second invoice, $1,130.00, which appears on the attorney's invoice as "costs for auctioneer for further advertising," is unreasonable (Debtor does not elaborate as to why) and, in any event, assessed postpetition, when any "further advertising" would have been a violation of the automatic stay; third, that the

---

[12] In the brief he filed after the evidentiary hearing, the Debtor further objected to the Trust's attorney's fees on the basis that the accounting adduced by the firm for its services does not conform to the requirements of this court's local rules for fee applications. The Debtor did not raise this issue in his objection to claim but only after the evidentiary hearing, without fair notice to the Trust. I therefore deem it untimely and waived. In any event, Attorney Shapiro's affidavit, with supporting documents, is quite sufficiently detailed for present purposes. Moreover, in his objection to the proof of claim, the Debtor conceded that except with respect to specific enumerated charges, "the attorney fees charged does not seem unreasonable."

12

auctioneer fee of $750 (which is part of the first invoice, for $1,905.00) is unreasonable in the absence of explanation; and fourth, that the auctioneer fee of $300 (which is part of the second invoice, for $1,130.00) is unreasonable in the absence of explanation.

The Debtor first argues that the first invoice amount is excessive because no auction ever took place. To be clear, the Debtor does not contend that the amount of the fee is not in keeping with market rates for the services rendered. Nor does he contend that it is not a usual and ordinary practice among auctioneers to charge a fee even when a sale for which it has prepared does not occur because of a bankruptcy filing. Nor does he contend that the nonoccurrence of the foreclosure sale was the fault of the Auctioneer or the Trust.

The sales here were derailed only by the Debtor's bankruptcy filings. The Court can take judicial notice that—as the Debtor did in this instance, twice—mortgagors not infrequently file their bankruptcy petitions only on the eve of foreclosure, when, as Jeffrey Mann testified, much of the auctioneer's work is already done. There is nothing inappropriate about an auctioneer's charging for work performed before the bankruptcy filing and even for the cost of efforts that occur in conjunction with cancelling or adjourning a foreclosure sale stayed by a bankruptcy filing. The fact that the auction sale was averted by bankruptcy does not make the invoice excessive.

The Debtor next contends that the amount of the second invoice is unreasonable but without an explanation as to why. For lack of elaboration, this aspersion of unreasonableness does not pierce the prima facie validity of the claim as to the charge it challenges. The Debtor also argues that the amount of the second invoice, $1,130.00, should be disallowed because this charge was assessed postpetition, when any "further advertising" would have been a violation of the automatic stay. The Debtor has adduced no evidence that the advertising expenses included in this invoice were incurred after the Trust received notice of his bankruptcy filing. Rather, the evidence suggests that the advertising in question was placed to run on August 23, 2009, a Sunday, in anticipation of the auction sale scheduled for August 27, 2009.

13

The Debtor also filed his bankruptcy petition on August 23, 2009 at 6:26 p.m.  The Trust and its attorney and auctioneer could not have known about the filing when the advertisement was placed because the filing had not yet occurred.  The expenses were thus incurred before the bankruptcy filing, not in violation of the stay.  Only the billing to the Trust's law firm occurred postpetition.  The charge is appropriate.

Lastly, the Debtor objects to two auctioneer's charges—one for $750 billed on July 21, 2009 and one for $300 billed on August 27, 2009—stating that in the absence of explanation, these are "unreasonable."  Again, the Debtor did not in his objection elaborate as to why these charges are unreasonable, and accordingly I again conclude that these objections do not pierce the prima facie validity of the claim as to the charges in question.  In addition, the charges are not evidently unreasonable.  The $750 is for services relating to the first scheduled auction date, which auction was derailed by the Debtor's first bankruptcy filing.  This charge, the auctioneer explained, consists of two parts:  $450 for the work involved in initially planning and scheduling the auction sale scheduled for June 30, 2009; and $300 for its services in conjunction with the continuance or cancelation of the scheduled auction, the cancelation having been necessitated by the Debtor's first bankruptcy filing.  Both amounts are its standard charges.  The explanation is adequate and the charges appropriate.  The $300 charge is for the auctioneer's services in conjunction with the continuance or cancelation of the August 27 auction.  The Court has already ruled that it is not inappropriate for an auctioneer to assess a fee for the continuance or cancelation of an auction sale averted by a bankruptcy filing.[13]

---

[13] In his posttrial brief, the Debtor raised for the first time two additional objections.  Both are untimely and therefore deemed waived.  Even aside from their untimeliness, neither has merit.  The Debtor first argues that the Auctioneer's fees and expenses for advertising should be disallowed because the Auctioneer did not comply with the statutory requirement of publishing notice of the foreclosure once a week for three weeks, for which he cites G.L. c. 254, § 5A.  As Jeffrey Mann conceded, the Auctioneer's advertising did not satisfy this requirement; rather, the requirement in question was satisfied by other ads placed directly by the Trust's attorneys in the Cambridge Chronicle.  The Auctioneer's advertisements were intended to and did satisfy the separate requirement of commercial reasonableness, established by case law in this district, which requirement the legal notices alone do not satisfy.  See *In re Ruebeck, 55 B.R. 163* (Bankr. D. Mass. 1983) and *In re Edry*, 201 BR 604 (Bankr. D. Mass. 1996).  Second, the Debtor faults the Auctioneer and the Trust for not having adduced at the hearing copies of the advertisements the Auctioneer placed and of the newspaper invoices for that advertising; without them, he says, the Court

  c. **Extent of Secured Claim**

The Debtor closes his Objection by stating that "[f]or the reasons set forth in the separate motion to avoid the [Trust's] lien, Jones also avers that the [Trust] is not secured, or is secured only as to part of its claim." However, by separate order, the separate motion was denied, and therefore there is no basis on which to hold that the lien is unsecured. In addition, in his schedule of real property, the Debtor valued his unit at $276,841.00; and in his schedule of secured claims, he identified only one other lien on the property, a mortgage in the amount of $1.00. The Trust's claim therefore is fully secure. In accordance with the state court judgment and 11 U.S.C. § 506(b), the Trust's secured claim is not limited to amounts presently adjudicated but may increase to include further amounts—including common area charges, late fees, and costs incurred in proceeding with the sale, such as advertising costs, attorney's fees, and auctioneer's fees related thereto—which amounts would be considered part of the lien to the extent of available value.

**CONCLUSION**

For the reasons set forth above, the Court will overrule the Debtor's objection in all respects and allow the Trust's amended secured claim in its entirety, without prejudice to increase in accordance with the state court judgment and 11 U.S.C. § 506(b). A separate order will enter accordingly and requiring the Debtor to file an amended plan, as his present plan does not propose to pay the full amount of this claim.

Date: March 15, 2011

              _____
              Frank J. Bailey
              United States Bankruptcy Judge

---

cannot determine whether the ads satisfied the statutory requirement and whether the amount charged was correct. Neither was required: the statutory requirement did not apply to the ads in question, and the Debtor had not objected to either the accuracy of the invoices (as opposed to their reasonableness) or to the legal sufficiency of the advertising.

15